Donald C. ANDERSON and Gernhild Anderson, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Civ. No. 1–76–423.

United States District Court,
D. Minnesota,
Fourth Division.

March 30, 1979.

William R. Busch, St. Paul, Minn., for plaintiffs.

Lawrence E. Meuwissen, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This case presents the troublesome issue of whether income to the grantee from the "release" of a "thirty (30) day right of refusal" to the original grantor should be treated for tax purposes as ordinary income or as capital gain. The plaintiff taxpayers in this action are Donald C. Anderson and Gernhild Anderson. Since Gernhild Anderson was not specifically involved in any of the transactions giving rise to this litigation, and is involved in this proceeding only because of signing a joint return, any reference in this order to the taxpayer refers to Donald Anderson. The Andersons were at all times material to this action residents of Rochester, Minnesota. Under the provisions of I.R.C. § 7422(f)(1), the United States of America is the proper party defendant in this action. This Court has jurisdiction under the provisions of 28 U.S.C. § 1346(a)(1).

This matter was tried before the Court without a jury. The Court, having considered all the testimony, exhibits,[1] arguments, memorandum of counsel, files and records hereby makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FACTUAL BACKGROUND

Plaintiff taxpayers filed a joint federal income tax return for the calendar year 1972 with the Internal Revenue Service Center in Ogden, Utah, paying in full the $233,529.18 amount due. The taxpayers later filed a claim for a partial refund of taxes paid under the 1972 joint return. After allowing six months for administrative action on their claim, they filed this tax refund action.

On November 1, 1962 the Sonor Hotel Corporation, a Tennessee corporation (hereinafter referred to as Sonor), acquired from the Holiday Inns of America, Inc. (hereinafter referred to as Holiday Inn) a Holiday Inn franchise, for a specified location in Rochester, Minnesota. Taxpayer Donald C. Anderson was one of the original shareholders in Sonor and a moving force behind the decision to develop a Holiday Inn franchise in Rochester. The Sonor franchise was restricted by the terms of the license agreement with Holiday Inn to the licensed territory described as the "N.E. Corner U.S. # 63 & 17 St. S.W." (1630 Broadway). The franchise was limited to the specific location granted in the license agreement and according to the agreement, the license or franchise was not transferrable by Sonor without Holiday Inn's written consent.

Sonor was formed in 1962 by six shareholders, including Anderson, and Lloyd Hobbs was selected president. The construction of the original Sonor facility at 1630 Broadway in Rochester was financed by a $750,000 mortgage loan that Sonor had obtained from a local bank. Donald Anderson and the other shareholders of Sonor were co-makers of that mortgage note. Sonor's motor inn facilities opened for business in November of 1963.

Anderson's records filed with the Internal Revenue Service show that on December 30, 1963, he purchased sixty-six shares of Sonor

---

1. At the time of trial the Court reserved ruling on the admissibility of the deposition of Donald C. Anderson, taken on December 14, 1977. Pursuant to Federal Rule of Civil Procedure 32(a)(2) and Federal Rule of Evidence 804(b)(1), the Court has determined that the deposition should be admitted.

stock. On January 12, 1964, Anderson obtained an additional sixty-nine shares of Sonor stock from two other shareholders. Also in January of 1964, Sonor leased its motor inn facilities in Rochester to Anderson for a twenty-year term at a net rental of $8,500 per month, plus a percentage of the restaurant receipts. Anderson also entered into a written stock option agreement to buy the remaining 50% of outstanding Sonor stock from Hobbs.

In 1966, Anderson became involved in efforts regarding the construction of a possible new Holiday Inn franchised facility in the Rochester area. Anderson was also contemporaneously considering plans to expand the Sonor Holiday Inn facility to almost double its then existing capacity. During this time period, Anderson went to meet with Kemmons Wilson, Chairman of the Board of Directors of Holiday Inn. At that meeting, Anderson asked for and obtained assurances that if another Holiday Inn franchise were to be granted in the Rochester area, he would be given a certain length of time to begin developing it himself. Lloyd Hobbs, then president of Sonor, did not accompany Anderson to that meeting. These assurances from Kemmons Wilson were included in the following letter:

December 20, 1966
Mr. Donald C. Anderson
Holiday Inn
Rochester, Minn.
Dear Don:
We have been very happy with your operation in Rochester, and are happy to learn that you are planning to build 120 rooms to the North of your existing Inn.
We would be very glad to work with you and certainly would not give anyone else a franchise without giving you a thirty (30) day right of refusal.
Sincerely yours,
HOLIDAY INNS OF AMERICA, INC.
/s/
Kemmons Wilson
Chairman of the Board

In early 1967, in conjunction with the financing of the expansion of Sonor's motor inn facilities in Rochester, Sonor entered into a mortgage refinancing loan for $1,100,000. Sonor's mortgage note to the lending bank was personally guaranteed by both Anderson and Hobbs, who both also signed on behalf of Sonor. After the mortgage refinancing, Anderson's lease of Sonor's existing facilities was amended to increase the net rental from $8,500 per month to $14,166 per month, plus the existing percentage of the restaurant receipts. The mortgage refinancing loan allowed the Sonor facility to expand its operations by adding 80 new guest rooms. At the time of the negotiations between Anderson and Wilson, the issue of expansion had obviously been discussed since the letter of December 20, 1966, specifically made reference to plans to add "120 rooms to the North of your existing Inn."

In January of 1968, Anderson exercised his option to purchase the remaining Sonor stock from Lloyd Hobbs. At the time of the exercise of his option, Anderson's lease of Sonor's motor inn facilities in Rochester was terminated by mutual agreement and thereafter Sonor operated the motor inn facilities at 1630 Broadway. Anderson thus became the sole shareholder of Sonor. In January of 1970, Anderson completed payment of the purchase price for the remaining 50% of Sonor stock he had purchased earlier.

In 1971 an existing 350 room Sheraton Motor Inn operated by the Sheroc Corporation (hereinafter referred to as Sheroc), became available in downtown Rochester. Holiday Inn was considering taking over the former Sheraton facility and operating it under a management contract with Sheroc when Holiday Inn officials contacted Anderson and explained its opportunity to convert the existing Sheraton facility into a Holiday Inn. Anderson expressed his feeling that this was contrary to his understanding of the December 20, 1966 letter's thirty-day right of refusal and ultimately went to Memphis to meet with Holiday Inn officials.

As a result of negotiations, Holiday Inn and Anderson reached an agreement to release Holiday Inn from its obligations under

the December 20, 1966 letter granting Anderson the thirty-day right of refusal. In exchange for the release of his right of refusal, Anderson received from Holiday Inn a $100,000 lump sum payment, plus a 20% annual share of the management fees received by Holiday Inn for its operation of the Sheroc facility for a 22-year period. The management fees received by Holiday Inn from the Sheroc facility were basically defined as five percent of the gross revenues of the Sheroc facility. The sums that were received by Anderson from Holiday Inn under the release agreement were reported in plaintiff's federal income tax return for 1972 and totaled $130,638.14. Anderson now maintains that the payments totaling $130,638.14 were reported erroneously as ordinary income on his 1972 federal income tax return and should instead have been reported as long-term capital gain from the sale or exchange of a capital asset. Anderson therefore concludes that he overreported and overpaid his 1972 federal income tax.

On April 13, 1976, Anderson filed a claim for refund on the ground that the 1972 income tax return was in error and that the $100,000 item should have been reported on Schedule D, "Capital Gains and Losses." In the refund claim the taxpayer contended that the $100,000 represented income received

> for the termination and release of his exclusive franchise rights—first refusal rights in the Rochester, Minnesota area which he held from a national motel operating and franchise corporation . . . .

In the 1972 return the taxpayer also reported an item in the amount of $30,638.14 which was identified as "Commissions rec'd from Sheroc Corp. on sales in Holiday Inn—downtown—Rochester, Minnesota." This item was also entered on the 1972 return as ordinary income. At the time of trial, the plaintiffs sought leave to amend their complaint in this action to assert a claim that this "commission" item actually represented the first annual payment of management fees under the November 9, 1971, release and was thus also subject to capital gain treatment.

## MOTION FOR LEAVE TO AMEND THE COMPLAINT

■ The first issue which must be resolved is the plaintiffs' motion under Federal Rule of Civil Procedure 15 for leave to amend their complaint. Rule 15(a) states that leave to amend a pleading "shall be freely given when justice so requires." The government maintains that leave to amend should be denied here since the taxpayer did not file a separate refund claim for the "commission" item. The government asserts that since the claim filed by the taxpayer sought a refund for only the $100,000 amount, the taxpayer should be barred for jurisdictional reasons from raising the issue of the additional $30,638.14 and the motion for leave to amend the complaint to include that amount should be denied.

The provision of the Internal Revenue Code that governs the jurisdiction of this Court over refund claims is I.R.C. § 7422(a).[2] In effect, Section 7422(a) of the Code provides that no suit may be maintained for the recovery of any tax until a claim for refund has been filed in accordance with the applicable Treasury Regulations. The Regulation specifying the form and contents of a refund claim is found in Treas.Reg. § 301.6402–2(b)(1), which provides:

> No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of such period. The

2. I.R.C. § 7422(a) provides:

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof.

claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. The statement of the grounds and facts must be verified by a written declaration that it is made under the penalties of perjury. A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit. The pertinent issue here is whether or not the refund claim set forth "facts sufficient to apprise the Commissioner of the exact basis" on which recovery is claimed, as required by Treas.Reg. § 301.6402–2(b)(1). The "facts" set forth by the taxpayer include the recitation in the refund claim of: (1) the December 20, 1966, letter from Kemmons Wilson to Anderson; (2) the release of November 9, 1971, between Holiday Inn and Anderson wherein the cancellation of the thirty-day right of refusal established the amounts that Anderson was to receive; and (3) the statement in the refund claim that there had been an erroneous reporting of funds in the taxpayer's 1972 return which were reported as ordinary income rather than as long-term capital gain. In the instant case the grounds for recovery set out in the plaintiffs' refund claim are exactly the same grounds for recovery that are asserted in the amended complaint.

The argument that the misstatement as to the measure of recovery may have misled or prejudiced the Commissioner is factually unsupportable. The only factual element that is enlarged in the amended complaint concerns the total amount of Anderson's receipts under the release agreement, which in no way prejudiced the government. This amount has nothing to do with the *grounds* on which the taxpayers' recovery is based, and therefore no jurisdictional problem is presented. *See also Burrell v. Fahs,* 232 F.2d 163 (5th Cir. 1956); *National Forge & Ordinance Company v. United States,* 151 F.Supp. 937, 139 Ct.Cl. 204 (1957); 10 Mertens, *Law of Federal Income Taxation,* § 58.21 (1976 rev.) and cases cited therein. Accordingly, plaintiffs' motion for leave to amend their complaint to seek the recovery of the $30,638.14 "commission" item for 1972 is hereby granted.

*THE THIRTY–DAY RIGHT OF REFUSAL*

Both the taxpayer and the government argue that a specific section of the Code governs the tax consequences of the 1971 transaction involving Anderson and Holiday Inn. The taxpayer argues that this right of refusal transferred by the taxpayer amounted to an option under I.R.C. § 1234, and therefore capital gain results. The government argues that the 1971 transaction resulted in the transfer of a franchise and therefore the tax consequences of the transaction are governed by I.R.C. § 1253. The applicability of these statutory provisions is primarily determined by the nature of the right which the taxpayer possessed.

■ The Court has concluded that the thirty-day right of refusal granted to the taxpayer by Holiday Inn amounts to an enforceable contractual right which is preemptive or negative in nature. The testimony, and the December 20, 1966, letter itself, established that the right of refusal granted the taxpayer was the result of negotiation between Anderson and Wilson, representing Holiday Inn. The expansion undertaken of the Sonor facility was assured by the granting of the right of refusal. Holiday Inn, as a result of the assured expansion, received the benefit of increased revenue because of the expansion. Anderson, on the other hand, incurred a detriment by cosigning the mortgage note entered into to achieve the expansion and by generally assuming the financial risk involved in the Sonor expansion. Therefore, consideration for Holiday Inn's contractual promise is clearly present. *Cederstrand v. Lutheran Brotherhood,* 263 Minn. 520, 117 N.W.2d 213 (1962); *Baehr v. Penn-O-Tex Oil Corp.,* 258 Minn. 533, 104 N.W.2d 661 (1960).

■ Although the parties to this agreement did not specify an exact price in the 1966 letter, the use of the language "[w]e . . . would not give anyone else a franchise without giving you a thirty (30) day right of refusal" sufficiently defined

the contours of the right of refusal granted Anderson. *Cf. King v. Dalton Motors, Inc.,* 260 Minn. 124, 109 N.W.2d 51 (1961) (phrases such as "right of first refusal," "first option" or the like have established meanings). The Court has concluded that the language contained in the December 20, 1966, letter clearly indicates that Anderson had the right to purchase any additional franchise or its equivalent for the same price and on the same terms as those of an offer made by a third person that Holiday Inn would accept or by an offer made to the public generally by Holiday Inn. *Id.* at 52; 1A Corbin, *Contracts,* § 261, p. 470 (1963). The right to purchase the franchise or its equivalent on the same terms as another would have remained in the taxpayer for a thirty-day period upon notification by Holiday Inn, and would have expired thereafter.

As the right of refusal was dependent on Holiday Inn initiating action in the Rochester area with respect to a new franchise or its equivalent, the taxpayer's rights were preemptive or negative in nature, rather than affirmative. In short, Anderson possessed a negative or preemptive power to prevent any disposition of an additional Holiday Inn franchise or its equivalent in the Rochester, Minnesota, area for a period of thirty days after notification by Holiday Inn. This negative or preemptive power was an enforceable right for which either legal or equitable relief would have been available in the event of a breach. *See* 1A Corbin, *Contracts,* § 261, p. 471 n. 13 (1963).

## *OPTIONS TO BUY OR SELL*

The taxpayer has argued that the right of refusal here amounts to an option, and therefore that I.R.C. § 1234(a)[3] governs the transaction. Anderson correctly contends that Section 1234 requires that the tax status of the sale of an option to purchase an asset is dependent on the tax status of the asset underlying the option. Plaintiff therefore reasons that as a franchise, being a capital asset, underlies the "option to purchase" or right of refusal here, capital gain treatment with respect to the sale of the thirty-day right of refusal is warranted. *See, e. g., Dairy Queen v. Commissioner,* 250 F.2d 503 (10th Cir. 1957).

The initial issue with respect to the taxpayer's argument is whether the thirty-day right of refusal amounts to a "privilege or option" so as to render Section 1234 operative. Unfortunately, the Code does not define "privilege or option." However, it has been generally recognized that privilege is synonymous with option, as the term relates to the element of choice possessed by the holder of the option. *Saunders v. United States,* 450 F.2d 1047, 1049 n. 6 (9th Cir. 1971); Rev.Rul. 58–234, 1958–1 C.B. 279. The term "option" has been variously defined. *Saunders v. United States,* 450 F.2d 1047, 1049 (9th Cir. 1971) ("unilateral agreements which are inflexibly binding upon the purported vendor"); *Lawler v. Commissioner of Internal Revenue,* 78 F.2d 567, 568 (9th Cir. 1935) ("an option gives the right to purchase, within a limited time, without imposing any obligation to purchase . . . .").

The Court has concluded that the thirty-day right of refusal in issue here is not a "privilege or option" within the meaning of Section 1234. Rights of refusal have traditionally not been viewed as option contracts. 1A Corbin, *Contracts,* § 261 (1963). *See, e. g. King v. Dalton Motors, Inc.,* 260 Minn. 124, 109 N.W.2d 51, 53 (1961); *Old Mission Peninsula School District v. French,* 362 Mich. 546, 107 N.W.2d 758 (1961); *London v. Joslovitz,* 110 N.Y.S.2d 56, 279 App. Div. 957 (1952); *In re Rigby's Estate,* 62 Wyo. 401, 167 P.2d 964 (1946). Rather,

---

**3.** Section 1234(a) provides:

Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).

I.R.C. § 1234 was amended in the Tax Reform Act of 1976, but the amendments have no application to this proceeding.

rights of refusal have generally been viewed as preemptive rights which are transformed into options to purchase upon the holder's receiving notice from the grantor that the time period in which to refuse or accept should commence. 1A Wigmore, *Contracts,* § 261, pp. 472–73 (1963) (a right of refusal is a right that the holder *shall be given an option to purchase* before the grantor makes a contract to sell to another) (emphasis added). The taxpayer here had no right to purchase a Holiday Inn franchise or its equivalent until Holiday Inn initiated action with respect to additional franchises. In short, Anderson simply had no right to purchase a franchise because he had no power of acceptance until Holiday Inn took action with respect to an additional franchise or its equivalent in the Rochester area and notified the taxpayer that his rights under the right of refusal had accrued. Once such action occurred, the taxpayer's right of refusal would have become an option to purchase a franchise. Here however, rather than allowing the taxpayer the right to purchase an additional franchise or its equivalent, and thereby creating a power of acceptance in Anderson, Holiday Inn negotiated and obtained a release of Anderson's right of

refusal in order to manage the Sheroc facility itself. Thus, the right of refusal never progressed to a point where it could be properly termed an option, as Holiday Inn never took action which would have allowed Anderson to decide if he should acquire the Sheroc facility. As taxpayer's thirty-day right of refusal never developed into an option, I.R.C. § 1234 therefore has no application to the instant proceeding. Absent action by Holiday Inn which would have given Anderson the opportunity for thirty days to accept Holiday Inn's offer to acquire a Holiday Inn franchise or its equivalent, no option could result for purposes of Section 1234, because the taxpayer had no power of acceptance or right to purchase a franchise or the equivalent thereof.

## TRANSFER OF A FRANCHISE

The government maintains that in releasing to Holiday Inn the thirty-day right of refusal, the taxpayer was in fact transferring part of a "franchise" and thus should come under the provisions of I.R.C. § 1253.[4] Specifically, the government argues that payments received by Anderson in 1972 as his share of the management fees derived by Holiday Inn from the former Sheroc

4. Section 1253 provides in part:

(a) General rule. A transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name.

(b) Definitions. For purposes of this section—

(1) Franchise. The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area.

(2) Significant power, right, or continuing interest. The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights with respect to the interest transferred:

(A) A right to disapprove any assignment of such interest, or any part thereof.

(B) A right to terminate at will.

(C) A right to prescribe the standards of quality of products used or sold, or services furnished and of the equipment and facilities used to promote such products or services.

(D) A right to require that the transferee sell or advertise only products or services of the transferor.

(E) A right to require that the transferee purchase substantially all of his supplies and equipment from the transferor.

(F) A right to payments contingent on the productivity, use, or disposition of the subject matter of the interest transferred, if such payments constitute a substantial element under the transfer agreement.

(3) Transfer. The term "transfer" includes the renewal of a franchise, trademark, or trade name.

(c) Treatment of contingent payments by transferor. Amounts received or accrued on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name which are contingent on the productivity, use, or disposition of the franchise, trademark, or trade name transferred shall be treated as amounts received or accrued from the sale or other disposition of property which is not a capital asset.

facility are contingent payments within the meaning of I.R.C. § 1253(b)(2)(F), that the taxpayer has therefore retained the requisite "significant power, right or continuing interest" and thus there is no "sale or exchange of a capital asset" because of the general rule embodied in I.R.C. § 1253(a).

■ The government makes a number of arguments with respect to the applicability of I.R.C. § 1253. First, relying on language contained in the taxpayers' claim for refund,[5] the government apparently argues that the thirty-day right of refusal amounts to a franchise within the meaning of I.R.C. § 1253. Second, the government argues that this thirty-day right of refusal was granted to Sonor, or at least that there is such a degree of interdependence between Sonor and Anderson that they should be treated as one entity for tax purposes. By virtue of Sonor's involvement with the alleged ownership of the thirty-day right of refusal, the government somehow hypothesizes that when the right of refusal was granted in 1966, it "enlarged" or became part of Sonor's original franchise for the location at 1630 Broadway in Rochester. Thus, the government concludes, a part of the Sonor franchise was transferred when the right of refusal was ultimately released to Holiday Inn in 1971, thereby requiring the application of 26 U.S.C. § 1253. All of these arguments are without merit, and consequently I.R.C. § 1253 is inapplicable to this proceeding.

■ The thirty-day right of refusal, by itself, was manifestly not a franchise for purposes of Section 1253. I.R.C. § 1253(b)(1) defines a franchise as an "agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area." A right of refusal essentially gives its owner a negative power to prevent the other party to the agreement from engaging in certain activities independently of the owner. *See* 1A Corbin, *Contracts*, § 261 (1963). The nature of the right of refusal granted to taxpayer is hardly a "right to distribute, sell, or provide goods, services or facilities" in the Rochester area as required by I.R.C. § 1253(b)(1) because the taxpayer had no affirmative right to provide Holiday Inn services in Rochester as a result of his ownership of the thirty-day right of refusal. As the right of refusal granted to Anderson cannot be characterized as a franchise, I.R.C. § 1253 is inapplicable because that section is limited in application to the transfers of "franchises, trademarks, and trade names."

■ As noted, the government also argues that the right of refusal to obtain a franchise was granted to Sonor rather than Anderson or that Anderson and Sonor are so interrelated that the two should be regarded as one entity for tax purposes. *Cf. Leisure Dynamics, Inc. v. Commissioner of Internal Revenue*, 494 F.2d 1340, 1345 (8th Cir. 1974). From this argument, the government postulates that the right of refusal "enlarged" Sonor's franchise and therefore a part of the Sonor franchise was transferred when the right of refusal was released to Holiday Inn in 1971. The Court has determined that the right of refusal was granted to Anderson personally, and that it would be inappropriate on this record to treat Sonor and Anderson collectively as one entity for tax purposes. Consequently, the government's arguments regarding franchise transfers must be rejected.

From the inception of Sonor and the Holiday Inn facility at 1630 Broadway in Rochester, Donald Anderson was responsible for the operations of the Inn, and Holiday Inn officials were aware of Anderson's responsibilities. During 1966, Anderson leased the Sonor facilities at 1630 Broadway and operated that facility in an individual capacity.

---

**5.** The government appears to argue that the use of the language "exclusive franchise rights" by the taxpayers in their claim for refund form somehow converts this right of refusal into a franchise for purposes of I.R.C. § 1253. Simply because a taxpayer labels certain rights as "franchise rights" does not transform a right of refusal into a "right to distribute, sell, or provide goods, services, or facilities, within a specified area," for purposes of I.R.C. § 1253(b)(1).

It was during this time that the letter granting the thirty-day right of refusal was sent to Anderson. The December 20, 1966, letter is specifically addressed to Donald C. Anderson, Holiday Inn. Nowhere in the letter is there any reference to Sonor. In 1966, Lloyd Hobbs was the President of the Sonor Hotel Corporation. Hobbs was not involved in the negotiations conducted by Anderson with Holiday Inn which occurred prior to Anderson's receiving the December 20th letter, and the only evidence shows that Hobbs was unaware of any meetings. Moreover, one of the reasons that Anderson acquired the right of refusal was because of his interest and plans to obtain an additional Holiday Inn franchise, apart from the Sonor facility, in the Rochester area.[6] In the taxpayer's deposition, the following testimony was developed:

Q. Okay, Now, this is a letter December 20, 1966?

A. Uhm hum (affirmative).

Q. From Mr. Wilson, the chairman of Holiday Inn, to you?

A. Yes.

Q. And can you tell me how that letter came about?

A. Well, a group of people were going to build another Holiday Inn in downtown Rochester and we were at that time looking for another site in Rochester for an additional Holiday Inn franchise.

We went to Mr. Wilson and explained what we were doing.

Q. Okay, Just a minute. Who is we?

A. I'm talking about myself we.

Q. Okay. What about Mr. Hobbs?

A. No. Mr. Hobbs was not with us at this time. And—

Q. Was Mr. Hobbs aware of that?

A. Pardon?

Q. I'm sorry, Was Mr. Hobbs aware of that?

A. I don't know if he was aware of it, knew of it or not.[7]

All of these factors lead to the conclusion that the right of refusal was granted to Anderson alone.

The government asserts that Sonor and Anderson should be regarded as one entity for tax purposes. The government points out that Anderson became the sole shareholder of Sonor prior to entering the release agreement with Holiday Inn and that Anderson also signed the 1971 release agreement on behalf of Sonor as well as himself. These factors, the government reasons, justify the conclusion that the corporateness of Sonor should be disregarded and that Anderson and Sonor should be viewed collectively as the owner of the thirty-day right of refusal. It is well settled that the fact that a taxpayer exercises complete control over a corporation, absent a showing that the corporation served no business function, does not justify disregarding the corporate entity for tax purposes. *Elot H. Raffety Farms, Inc. v. United States*, 511 F.2d 1234 (8th Cir.), *cert. denied*, 423 U.S. 834, 96 S.Ct. 57, 46 L.Ed.2d 96 (1975); *Sid W. Richardson Foundation v. United States*, 430 F.2d 710 (5th Cir. 1970), *cert. denied*, 401 U.S. 1009, 91 S.Ct. 1251, 28 L.Ed.2d 544 (1971). Moreover, merely because Holiday Inn insisted that Sonor be a party to the release agreement entered into in 1971 does not compel a finding that Sonor owned part of the right of refusal or that this Court should disregard the corporate form of Sonor and treat Anderson and Sonor as functionally one tax entity. Thus, as Sonor and Anderson are to be treated separately for tax purposes, the government's argument regarding the application of I.R.C. § 1253 must be rejected.

 However, even assuming that Sonor and Anderson should be treated as one tax entity or that the right of refusal was granted to Sonor exclusively, the government's argument that a transfer of a franchise occurred in 1971 is incorrect. The government, again relying on the inappropriate language in the taxpayers' claim for

---

6. In this regard, it should be noted that Holiday Inn granted Donald Anderson, not Sonor, two additional Holiday Inn franchises in Minnesota.

7. Throughout the testimony of Donald Anderson, he constantly referred to "we" as meaning his immediate family, and not Sonor.

refund, has proceeded throughout this litigation on the assumption that the thirty-day right of refusal somehow enlarged or became part of the Sonor "franchise" at 1630 Broadway, all within the meaning of 26 U.S.C. § 1253(b)(1). The government, however, fails to provide any reasons whatsoever as to how or why this negative power became part of Sonor's "right to . . . provide . . . services, or facilities . . . ." at the exclusive specified location, 1630 Broadway. This argument becomes even more perplexing when the right of refusal relates to a potential future franchise completely apart from the Sonor-Broadway facility, and when Sonor was granted a franchise limited to a specified location at 1630 Broadway.[8] As there is no basis to find that the right of refusal became part of or enlarged the preexisting Sonor franchise, no franchise was transfer-

red when the thirty-day right of refusal was released to Holiday Inn in 1971 (even if Sonor is considered the owner of the right of refusal or if Anderson and Sonor are treated as one tax entity) and thus I.R.C. § 1253 is not operative here.

## SALE OR EXCHANGE OF A CAPITAL ASSET

 Since a finding that Sections 1253 or 1234 are not applicable to the instant transaction does not answer the question of whether or not this transaction should be treated as the sale or exchange of a capital asset, that question must now be explored. The Internal Revenue Code defines capital assets in a negative manner, providing that such assets are all "property" not falling within specific exclusions. I.R.C. § 1221.[9] There is no dispute in the

---

**8.** From 1964 to 1968, Anderson leased the premises at 1630 Broadway from Sonor, and promised in the lease to observe and perform the "obligations, covenants and agreements" imposed upon Sonor by the license agreement with Holiday Inn. In the event Anderson defaulted in any respect, Sonor was empowered to either cure the default itself or retake possession of the premises and terminate the lease with Anderson. The lease between Sonor and Anderson was terminated once Anderson exercised his stock option and acquired sole control of Sonor. The license agreement between Sonor and Holiday Inn recited that the license or franchise granted Sonor was "non-transferrable without the written consent" of Holiday Inn, and no such consent was obtained for the lease agreement with Anderson.

Although not specifically urged by the government, a similar argument could be made that when Anderson leased the premises he also leased the Sonor franchise, that the right of refusal "enlarged" his leased franchise, and thus a part of a franchise was transferred in 1971. This argument must be rejected as well. First, the license agreement prohibited the transfer of the "license" or franchise without Holiday Inn's written consent, which was not obtained. It therefore does not follow that the franchise could have been or was effectively transferred to Anderson as a result of his lease of the premises. Moreover, even if the Sonor franchise was transferred to Anderson as a result of the lease, there is still no basis to find that the right of refusal, being a negative power, became a part of or "enlarged" a preexisting franchise or "right to distribute, sell, or provide goods, services, or facilities, within a specified area" for purposes of I.R.C. § 1253(b)(1).

Thus, no transfer of a "franchise" for purposes of I.R.C. § 1253 occurred in 1971 when Anderson released his right of refusal to Holiday Inn.

**9.** I.R.C. § 1221 reads:

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—

(A) a taxpayer whose personal efforts created such property,

(B) in the case of a letter, memorandum or similar property for whom such property was prepared or produced, or

(C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

(5) an obligation of the United States or any of its possessions, or of a State or Terri-

present case that the thirty-day right of refusal at issue is not included in the list of exclusions found in I.R.C. § 1221. The matter is not, however, as simple as finding that none of the I.R.C. § 1221 exclusions apply since that section also requires that a "capital asset" be "property held by the taxpayer." Contract rights, while amounting to "property" for purposes of property law are not necessarily "property" for tax law purposes. *Commissioner of Internal Revenue v. P. G. Lake, Inc.,* 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); *Michtom v. United States,* 573 F.2d 58, 63 (Ct.Cl.1978). Although the issue of whether intangible contract rights constitute the property of which capital transactions are made is not entirely settled, this Court has determined that the release of the thirty-day right of refusal in 1971 amounted to the sale of a capital asset based on the reasoning of *Commissioner of Internal Revenue v. Ferrer,* 304 F.2d 125 (2d Cir. 1962).

In *Ferrer,* taxpayer Ferrer acquired the exclusive rights to produce a play, "Monsieur Toulouse," based on a novel written by Pierre LaMure. The agreement specified that Ferrer was given a lease of the exclusive production rights. In addition to this right, the agreement granted Ferrer the power to prevent author LaMure from transferring film rights for a specified period of time, the time period being linked to the play production dates. Ultimately, Ferrer released his rights to produce the play contemporaneously with LaMure's sale of the film and television rights to "Monsieur Toulouse" to Moulin Productions, Inc. (Moulin). By virtue of the release agreement, Ferrer was employed to perform as an actor in the film and was to receive a percentage of the net profits of the film. The issue presented to the Second Circuit Court of Appeals concerned the tax status of the amounts received as the taxpayer's percentage of the net profits from the film distribution. Judge Friendly, writing for the court, found that Ferrer's receipt of the

percentage of net profits from film distribution represented part capital gain and part ordinary income. In allocating the income received as a result of the profits from film distribution, Judge Friendly separately identified the contractual rights which the taxpayer released to Moulin, and separately evaluated the tax status of amounts received for the release of each contractual right. Two of these contractual rights were held to be property in the nature of a capital asset, while another contractual interest was held to be an ordinary income right. Judge Friendly interpreted the taxpayer's rights released to Moulin to be the following: 1) the lease of the play; 2) the right to share in the proceeds of the film if he produced the play; and 3) "his power, incident to that lease, to prevent any disposition of the motion picture rights until June 1, 1952, or, on making an additional $1,500 advance, to December 1, 1952 . . . ." *Id.* at 131. Reasoning that this third right specified above would be "protected in equity" and thus amounted to an "equitable interest" in the copyright, itself a capital asset, Judge Friendly concluded that the amount received for the release of this right was entitled to capital gain treatment. *Id.* at 133.

The taxpayer's contractual right in *Ferrer* to prevent any disposition of the motion picture rights for a specified period of time, held to be a capital asset in *Ferrer,* bears a striking resemblance to the thirty-day right of refusal in issue here. Anderson's power under the 1966 letter is simply that he has the right to obtain a franchise in the Rochester area to the exclusion of other persons for a thirty-day period—in short, a "negative power," as in *Ferrer,* "to prevent any disposition" of an additional franchise for a specified time. *Id.* at 133. The rationale for the *Ferrer* holding that the taxpayer's negative power constituted property was premised on the existence of the taxpayer's possession of an equitable interest in specif-

---

tory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

The 1976 amendments to I.R.C. § 1221 have no relevance to this proceeding.

ic property, that is, a copyright, which also amounted to a capital asset. *Id. See*, Eustice, *Contract Rights, Capital Gain, and Assignment of Income—the Ferrer Case*, 20 Tax L.Rev. 1, 12 (1964). The *Ferrer* court concluded that the taxpayer's negative power "would be protected in equity" and that Ferrer's power "clouded LaMure's title." *Id.* Likewise, in the instant proceeding, Holiday Inn's right to establish additional franchises in Rochester was "clouded" in the same manner that LaMure's rights were clouded in *Ferrer.* Holiday Inn's power to act independently in this respect was thus limited, and Anderson would have had access to equitable remedies [10] in the event Holiday Inn attempted to act independently of Anderson in granting Rochester franchises. Thus, as Anderson possessed a contractual right which would be enforceable in equity to prevent the disposition of an additional Rochester Holiday Inn franchise (itself a capital asset) or the equivalent thereof for thirty days, the taxpayer possessed property in the nature of a capital asset.

◼ In order to qualify for capital gain treatment, there must be a "sale or exchange" of property amounting to a capital asset. I.R.C. § 1222.[11] A "sale" has been defined as a "transfer of property for a fixed price in money or its equivalent." *Commissioner of Internal Revenue v. Brown*, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965). Moreover, income tax law is concerned with the voluntary passing of property and not with artificial conceptions of form. *Commissioner of Internal Revenue v. Ferrer*, 304 F.2d 125, 131 (2d Cir. 1962). The release or extinguishment of the thirty-day right of refusal here certainly benefitted Holiday Inn as it added to the rights of Holiday Inn. The transfer in 1971 of the right of refusal by Anderson to Holiday Inn removed an obstacle to the granting by Holiday Inn of additional Rochester franchises or the opportunity of Holiday Inn to engage in the management of an additional facility itself. As such, the release or extinguishment amounted to a "sale" for purposes of I.R.C. § 1222. *Saunders v. United States*, 450 F.2d 1047, 1049 n. 6 (9th Cir. 1971); *Commissioner of Internal Revenue v. Ferrer*, 304 F.2d 125, 131 (2d Cir. 1962); *Commissioner of Internal Revenue v. Ray*, 210 F.2d 390 (5th Cir.), *cert. denied*, 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654 (1954); *Robert D. Fraser*, 64 T.C. 41 (1975). Thus, the Court concludes that the release of the thirty-day right of refusal from Anderson to Holiday Inn in 1971 amounted to the sale of property held by the taxpayer under I.R.C. §§ 1221 and 1222.

◼ The government has also argued that the income derived from the release of the thirty-day right of refusal should be treated as ordinary income based on the decision in *Corn Products Refining Co. v. Commissioner of Internal Revenue*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). In *Corn Products*, the Supreme Court held that income from the sale of certain corn futures amounted to ordinary income because the futures were acquired and sold as an integral part of the taxpayer's business. As these corn futures served as both a form of insurance for price fluctuations and as a source of supply for the taxpayer's manufacturing operations, the Court concluded that the income derived from the sale of the corn futures was not the type of business income which should be afforded preferential capital gain treatment. *Corn Products* and its progeny require that the subject matter of the particular transaction and its purpose in the context of the taxpayer's business be evaluated to determine if the income received should be deemed ordinary in nature. 3B Mertens, *Law of Federal Income Taxation* (1973 Revision) § 22.11, p.

---

**10.** *See* 1A Corbin, *Contracts,* § 261 (1963) and cases cited therein.

**11.** I.R.C. § 1222(3) provides, for purposes of this proceeding:

(3) Long-term capital gain. The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

The six-month requirement was amended to one year in 1976.

100. The basic factors relevant in this analysis have been recognized to be the "factual background, the necessities of the particular business involved at the particular time involved, and the intentions of the taxpayer, both at the time the [asset was] originally purchased and at the time [the asset was] disposed of . . . ." *Schlumberger Technology Corp. v. United States,* 443 F.2d 1115, 1120 (5th Cir. 1971); *Booth Newspapers, Inc. v. United States,* 303 F.2d 916, 921 (Ct.Cl.1962). *See also Norton v. United States,* 551 F.2d 821 (Ct.Cl.1977), *cert. denied,* 434 U.S. 831, 98 S.Ct. 115, 54 L.Ed.2d 91 (1978).

The government has argued that Anderson obtained the thirty-day right of refusal to serve as a "hedge" or as protection for the taxpayer's existing hotel operation activities, and thus the right of refusal amounts to an integral part of taxpayer's business activities within the meaning of *Corn Products.* The unimpeached testimony of Anderson, however, supports the conclusion that the acquisition of the right of refusal served a dual purpose. First of all, the acquisition of the right of refusal admittedly served to protect the taxpayer's interest in the existing Sonor facility from potential competition, and thus served as a form of "insurance." On the other hand, its acquisition provided the taxpayer with a viable instrument to expand his hotel operations by obtaining additional Rochester franchises. As the taxpayer explained in his testimony:

Q Would you please tell the Court the circumstances that gave rise to Holiday Inn's giving you this letter, Exhibit 5?

A A group of people were going to build a second Holiday Inn in Rochester downtown, and at the time we heard this we had spent considerable time and money on a new location, Holiday Inn location. So we went to Holiday Inns, in fact, Clemons [sic] Wilson, who was the chairman of the board, and we had known him for sometime, and we told him about this problem. We also told him that we were expanding our present deal, but if they

were going to allow another franchise to this group, that it would interfere with our building a second Holiday Inn or expansion. At that time we talked about our relationship with Holiday Inns, Inc., we talked about our track record, we talked about our relations and he wrote this letter to us.

THE COURT: At the time this letter was written to you were you the sole owner of Sonor?

THE WITNESS: No.

By Mr. Busch:

Q In that connection I am going to ask you, when you referred to "we" in your just given answer whom are you describing?

A Well, I am sure that we are talking about—when we are talking about track record, when we are talking about Rochester, we are talking about myself.

Q The reason I ask is that you said "We went to Clemons [sic] Wilson." Who is that?

A I usually use that in the term of family.

This testimony establishes that Anderson acted in part to acquire the right of refusal to obtain additional franchises—or for investment reasons. While the acquisition of the right of refusal also undeniably served to protect Anderson's existing investment in the Sonor facility, thereby amounting to a form of "insurance," this factor is not dispositive. It has been recognized that an acquisition which serves as a means of protecting an existing investment may very well, as here, concurrently have investment overtones. *Schlumberger Technology Corp. v. United States,* 443 F.2d 1115, 1121 (5th Cir. 1971) (rejecting the government's proposed expansion-protection test under *Corn Products* as "dysfunctional" because an acquisition made to "expand" or advance a business into a new area can concomitantly serve to "protect" the existing business). Thus, while the acquisition of the right of refusal served to protect Anderson's invest-

ment in the Sonor facility from potential future Holiday Inn competition, the acquisition also served to further the taxpayer's investment goals with respect to the Sonor facility, as well as providing an investment advantage for future Holiday Inn franchises. Under these circumstances, the Court can only conclude that Anderson acted predominantly with an investment intent when he acquired the thirty-day right of refusal. Moreover, this investment purpose with respect to the right of refusal on the part of the taxpayer continued to manifest itself at the time the right of refusal was disposed of by Anderson in 1971. This latter conclusion is corroborated by the acquisition of two additional Holiday Inn franchises by Anderson as a result of the discussions culminating in the 1971 release of the right of refusal.[12] Thus, as Anderson acted throughout with an investment intent with respect to the right of refusal, the income obtained as a result of its release was not ordinary income under the *Corn Products* doctrine. *See Continental Illinois National Bank & Trust Co. of Chicago,* 69 T.C. 357 (1977); *W. W. Windle Co.,* 65 T.C. 694 (1976), *appeal dismissed,* 550 F.2d 43 (1st Cir.), *cert. denied,* 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977).

Therefore, the Court concludes that the release in 1971 by Anderson of his thirty-day right of refusal constituted the sale of a capital asset. As Anderson held the specific property involved here for approximately 58 months, the income derived from the sale of the right of refusal is entitled to long-term capital gain treatment. Thus, the plaintiffs are entitled to treat amounts received from the sale or release of the thirty-day right of refusal as long-term capital gain for tax purposes.

IT IS THEREFORE ADJUDGED THAT PLAINTIFFS Donald C. Anderson and Gernhild Anderson are entitled to treat amounts received from the sale or release of the right of refusal to Holiday Inn as long-term capital gain for tax purposes.

12. Anderson testified that he was granted two additional franchises at or around the time he entered into the release in 1971 with Holiday Inn, and while he gave up the Holiday Inn franchise in Owatonna, Minnesota, he operates a Holiday Inn in St. Cloud, Minnesota, through a separate corporation.