JULIAN C. STANFORD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ELIZABETH C. STANFORD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 77793, 77794. Filed September 30, 1960.

*Paul E. Anderson, Esq.,* for the petitioners.
*Richard G. Worden, Esq.,* for the respondent.

WITHEY, *Judge:* The respondent determined deficiencies in the income tax of petitioners Julian C. Stanford and Elizabeth C. Stanford for 1955 in the amounts of $1,326.30 and $1,411.40, respectively.

The only issue presented for our decision is the correctness of the respondent's action in determining that certain payments in the total amount of $10,662.48 received by petitioners in 1955 represent taxable income.

FINDINGS OF FACT.

A portion of the facts has been stipulated and is found accordingly.

Petitioners are husband and wife residing in Berkeley, California. They filed separate income tax returns for 1955 with the director of internal revenue at San Francisco, California. Hereinafter the word "petitioner" has reference to Julian C. Stanford.

Petitioners were born in Germany and were citizens and residents of that country until July 1937 when they left Germany for Holland. The petitioners are of Jewish extraction. Julian C. Stanford was born April 22, 1890, and had been employed since 1909 by the firm of Leonhard Tietz A.G., a German corporation engaged in the retail department store business. This firm was a large corporation having 41 department store branches, 65 10-cent chainstores, and a number of factories and wholesale firms, with total annual turnover of approximately 300 million marks, and having approximately 20,000 employees. Julian was first employed by that firm in February 1909 as a salesman. He subsequently became a buyer and in 1914 he was made a director of one of the branches of that firm. In 1920 he became a director and an officer of the firm itself.

As a director of the firm of Leonhard Tietz A.G., petitioner received an annual salary of 45,000 marks plus 3 per cent of the net profits of the company. On December 27, 1927, petitioner entered into a contract of employment with Leonhard Tietz A.G. Although this contract is unavailable, the material provisions thereof are substantially the same as those contained in a similar contract which provided in part as follows:

Between LEONHARD TIETZ AKTIENGESELLSCHAFT of Cologne, represented by the Chairman of the Board of Directors of the Corporation
and
Mr. GERHARD TIETZ of Cologne
the following

### EMPLOYMENT CONTRACT

has been concluded:

#### # 1

The Leonhard Tietz Corporation has appointed Mr. Gerhard Tietz as a Member of its Executive Committee * * * with the title of Director and the authorization to legally represent the corporation and to sign for it, together with another member of the Executive Committee or special agent * * * in accordance with Paragraph 13 of the by-laws of the corporation.

#### # 2

Mr. Gerhard Tietz receives a yearly remuneration of 37,500.-Goldmarks, an expense compensation of 7,500.-Goldmarks as well as a share of 3% of the net profit which remains after deduction of all reserves and depreciations.

## # 3

The yearly remuneration and the expense compensation are to be paid in monthly amounts at the end of each month, the share of profit at the end of the fiscal year. Should the employment terminate in the course of a fiscal year then the share of profit for the current year shall be calculated and paid in proportion to the period elapsed and be based on the balance sheet for the preceding fiscal year.

## # 4

Mr. Gerhard Tietz is obliged to follow the invitations of the Board of Directors for attending its meetings. He has to devote his entire energy to the corporation. He is prohibited to acquire, or to found, or to have a share directly or indirectly in a business in the branch of trade of the corporation, without the consent of the Board of Directors and to other members of the executive committee.

## # 5

The contract is valid from January 1st, 1927, for ten years and is being prolonged from five to five years every time if not cancelled three months before expiration of the first ten year contract period or before expiration of one of the following five year contract periods.

## # 6

The corporation and Mr. Gerhard Tietz have the right to demand, at any time, the pensioning of Mr. Gerhard Tietz, as soon as he is 65 years of age or he is unable to work. Then he receives a yearly pension of 30,000.-Goldmarks, until his death, payable at the end of each month in monthly installments.

## # 7

Should Mr. Gerhard Tietz be prevented from the regular performance of his duties for more than one year, either by sickness or by an other reason within his person, without his pensioning becoming effective, then his title to profit-sharing will rest for the time exceeding one year.

## # 8

If Mr. Gerhard Tietz dies before his pensioning then his eventually surviving widow shall continue to receive, besides his pro-rated share of profits for the current year, his full remuneration (not the share of profit) for the current year and the succeeding fiscal year, and from then on 30,000 Goldmarks for the following five years, and then 15,000.-Goldmarks until the end of her life. These amounts are also payable in monthly installments at the end of each month.

The pensioning lapses if the widow re-marries. The agreement of December 11, 1926 remains unaffected.

The stipulations in paragraphs 6 and 8 remain in force also if the Corporation, for any reason whatsoever, should proceed to discontinue the contract with Mr. Gerhard Tietz.

However no claim for pension shall exist if the discharge has been occasioned by an important reason within the person of Mr. Gerhard Tietz and which has caused his immediate dismissal.

The claim for pension lapses in case Mr. Gerhard Tietz, after his withdrawal, at a locality at which the Leonhard Tietz Aktiengesellschaft operates a retail

business, opens or participates in such, or concedes that his spouse or his minor children do the same.

# 9

In other respects the Law and the by-laws of the Corporation shall apply for this contract. Mr. Gerhard Tietz was born on November 16, 1894.

The firm of Leonhard Tietz A.G. was controlled by a family group known as the Tietz group which consisted of the relatives and descendants of the founder of the firm, Leonhard Tietz. Family control was maintained through the ownership of 52 per cent of the common stock of the company plus the ownership of the majority of the preferred shares. Julian owned approximately 5 per cent of the total outstanding stock of the firm. The par value of the common stock held by petitioner prior to the rise to power of Adolf Hitler was 1,600,000 marks. In 1930 his stock had a market value of approximately 300 per cent of its par value.

Petitioners owned a large residence in one of the finest areas in the city of Cologne and occupied a respected position in the communities in which they resided.

On January 30, 1933, Adolf Hitler became Chancellor of Germany. Thereafter the National Socialist (Nazi) Party, led by Hitler, was in control of Germany. One of the primary purposes of the Nazis was the complete elimination from Germany of persons of Jewish extraction. In accordance therewith the German Government under Hitler enacted many discriminatory laws against the Jewish residents of Germany.

On April 1, 1933, the German Government proclaimed a boycott against all department stores in Germany owned or controlled by Jewish persons. All such stores were closed. On the same date all the Jewish directors of Leonhard Tietz A.G. resigned in order to keep the stores open. The business of the Tietz firm was boycotted by members of the Nazi Party and Brown Shirt Guards. The business of Leonhard Tietz A.G. dropped by approximately 55 per cent during the first year of the boycott. The Nazi Government insisted that the Tietz firm elect only non-Jewish directors and transfer the capital of the corporation into non-Jewish hands. Petitioner, however, was subsequently invited by a new board of directors to return to the board and he again served there until September 1934 when he was forced by the Nazi Government to resign. Petitioner thereafter opened a consulting business and continued to consult with the members of the former Tietz firm, the name of which was changed to Kaufhof A.G. After the close of 1936 he rendered no further service of any kind to the Kaufhof firm.

During 1933 Julian was forced to sell his stock in the Tietz firm for which he received 200,000 marks.

Due to the oppression and discriminatory laws of the Nazi Government petitioners suffered further substantial losses. They were required to dispose of their residence which had cost them approximately 500,000 marks to build for a price of 180,000 marks. After leaving Germany they sold a second home for 50,000 marks that had been purchased for 110,000 marks. Upon leaving Germany in 1937, petitioners were required to pay a tax in the amount of 100,000 marks which was measured by 25 per cent of their total assets. At the time they left Germany they had bank accounts totaling approximately 300,000 marks but were able to recover only 6 to 7 per cent of their bank balances in 1938 while living in Holland. In June 1937 petitioners fled Germany and went to Holland where they were still residents at the time Holland was occupied by Nazi forces during 1940. Julian was arrested on August 12, 1940, by the Gestapo and was imprisoned for a period of 9 months. Upon his release from prison he was required to pay the Gestapo 3,200 to 3,500 marks for his board and lodging. In 1942 the petitioners contacted the underground movement in Holland and went into hiding. They stayed in hiding with underground protection for a period of approximately 3 years until Holland was liberated in May 1945.

In 1945 petitioner executed a power of attorney to a Dutch law firm authorizing it to file claims for damages against Kaufhof A.G. On May 12, 1949, the Military Government of the British Zone of Occupation in Germany adopted Law No. 59 which provided for the restitution of property to persons wrongfully deprived thereof within the period January 30, 1933, to May 8, 1945, for reasons of race, religion, etc. Under this law claims for restitution accrued to any person whose property was wrongfully confiscated. The party made liable for payment of such restitution under this law is defined therein as "the present possessor of confiscated intangible property or the present holder of a confiscated intangible interest." This law prescribes a detailed system of procedure for the filing and adjudication of such claims. A substantially identical law was adopted by the United States Military Government in the American Zone of Occupation in Germany and was likewise designated as Law No. 59.

In 1947 petitioners emigrated to the United States where they have since resided continuously. On November 5, 1952, they became naturalized citizens of the United States.

On June 14, 1949, Kaufhof A.G. advised petitioner by letter that it would "resume payment" of his pension in the amount of 30,000 marks per year. The letter sent by Kaufhof to petitioner reads in pertinent part as follows:

This is to confirm that we will resume payment of your pension of DM 30,000 p.a. to which you are entitled on account of prior contracts, effective July 1, 1948, and we re-affirm below the salient features of these contracts:

On your death your surviving widow is to receive a widow's pension in the identical amount of DM 30,000 p.a. until her death.

The widow's pension will terminate upon your wife's remarriage.

In all cases in which no widow's pension is to be paid, your children will receive on your death a pension until they are able to support themselves, but in no case after their 25th birthday, and, in the case of daughters, if they marry before, then only until date of marriage.

The orphan's pension will amount to ⅓ of the widow's pension for each child. However, the aggregate amount payable to all of your children may in no event exceed the widow's pension.

All payments are due and payable monthly in equal installments at the end of the month.

We confirm further that in case of deterioration of the value of the money within Germany (translator's note: inflation or increase of C.O.L.) your pension or that of your widow or children will be increased proportionately and raised in the same percentage as the pension payments to other recipients of pension of this corporation or of members of the Board of the Corporation to whom pension commitments have been made, including such fringe benefits (insurance or otherwise) which are being paid or have been contracted to be paid to such persons.

*       *       *       *       *       *       *

All claims which you may have for whatever cause for any period of time prior to June 30, 1948, are unaffected by this agreement.

On November 23, 1949, the Court of Restitution at the Court of Justice in Cologne, Germany, entered its decree in the matter of restitution claims of Julian C. Stanford et al. *v.* Kaufhof A.G. The decree provided in substance that Julian C. Stanford was entitled to receive 48,550 marks arising out of claims for salary and pension from Kaufhof A. G. in consideration of the fact that he had been required by the prewar German Government to transfer his residence to another country and that Kaufhof had suspended payments to him. This decree contained a general release of all the claims of petitioner against Kaufhof up to June 30, 1948.

In 1950 Kaufhof, pursuant to petitioner's claim, paid him 500,000 marks for the stock in the corporation which he had been forced by the Nazi Government to relinquish. The aggregate cost of the stock was 1,600,000 marks. During 1954 petitioner made a demand against Kaufhof for an additional 200,000 marks for the loss of his stock. Kaufhof refused to pay this claim.

Petitioners presented claims for other war and prewar losses and have effected recoveries thereon as follows:

(1) A claim for a loss in the amount of 300,000 marks on the sale of their place of residence in Cologne, which was allowed against the purchaser of the home in the amount of 110,000 marks.

(2) A claim for the loss of a second residence in the amount of 60,000 marks which was allowed against the purchaser of that residence in the amount of 54,000 marks.

(3) A claim against the German Government for 100,000 marks for the tax in that amount petitioners were required to pay upon leaving Germany. This claim was allowed to the extent of 20,000 marks.

(4) A claim for compensation for the time petitioner was imprisoned and lived underground in Holland was allowed in the amount of 2,200 marks.

In 1953, the German Government passed a supplemental law relating to compensation of victims of National Socialist persecution. This statute was enacted for the purpose of providing indemnification to persons persecuted by the Nazis and permitted such persons to recover against the German Government for the loss of liberty, personal injuries, and property confiscated by the Government, including discriminatory taxes.

On April 28, 1955, petitioners' attorney and Kaufhof entered into a memorandum agreement which provided in part as follows:

*Re: Pensions of the Tietz-Group*

I.

1.) On April 28, 1955, there took place, in connection with the preceding exhaustive deliberations with Dr. Klonz, a discussion with Dr. Ising of the more particular details of the increase of pensions of the following members of the Tietz-Group:

\*    \*    \*    \*    \*    \*    \*

b) Mr. J. C. Stanford, 1008 Middlefield Road, Berkeley 8, Calif., USA

\*    \*    \*    \*    \*    \*    \*

2.) In principal the retirement allowances shall be raised by 50 percent.

3.) The increases take effect from January 1st 1955.

The agreement also provided a formula for increasing the pension payments in the event of increases in the cost of living.

Petitioner attached to his income tax return for 1955 a statement which reads in part as follows:

Pursuant to a pension agreement entered into in the course of his employment by the Tietz Company, which agreement has been recognized as a valid and subsisting legal obligation of Westdeutsche Kaufhof A.G. the taxpayer is now receiving a regular pension from the said firm based upon and solely attributable to his past activities as an employee of Tietz A.G.

The payments in the amount of $10,662.48 received by petitioners from Kaufhof A.G. in 1955 represent the payment of his pension for that year.

OPINION.

Petitioners first contend that the payments in the amount of $10,662.48 received by them from Kaufhof A.G. in 1955 represent compensation for personal injuries suffered as a result of racial and religious persecution by the National Socialist (Nazi) regime and are therefore not includible in gross income by reason of section

104 (a) (2) of the Internal Revenue Code of 1954.[1] In support of their position, petitioners rely in part upon a ruling published by the respondent which provides in pertinent part as follows:

certain indemnification payments made by the Federal Republic of Germany to former German citizens, now citizens or residents of the United States, who were persecuted by the National-Socialist regime, are in the nature of reimbursement for the deprivation of civil or personal rights and, therefore, do not constitute taxable income to the recipients for United States income tax purposes. The specific laws * * * (3) Federal Supplementary Law for the Indemnification of Victims of National Socialist Persecution of September 18, 1953 * * *. [Rev. Rul. 57–505, 1957–2 C.B. 50. See also Rev. Rul. 56–518, 1956–2 C.B. 25.]

The record herein does not demonstrate that the payments in issue received by petitioners from Kaufhof in 1955 represent indemnification for personal injuries to either of the petitioners. The petitioners have not established and in fact do not appear to contend that any of the wrongs suffered while residing in Germany and Holland were committed by Kaufhof A.G. or that any liability whatever existed on the part of Kaufhof to compensate them for these wrongs. The many hardships and indignities suffered by petitioners under the regime of Hitler and the Nazi Party were perpetrated by the agents and officers of the National Socialist Government. Petitioners have presented a series of claims for indemnification against the German Government and against certain individuals who are liable under the restitution laws to compensate them, and have made certain recoveries thereon. No such claims for compensation for personal injuries or Nazi persecution were filed against Kaufhof. Further, it is not shown that either Kaufhof or petitioner regarded the payments in question as constituting reimbursement or indemnification for any claim or cause of action against Kaufhof.

The documents here in evidence plainly indicate that the payments in question represent pension payments based upon petitioner's former employment by Kaufhof. The correspondence and the contracts between petitioner and Kaufhof clearly show that the amount received from the corporation in 1955 represents the payment of his pension arising out of his original contract of employment executed in 1927 which provided for the payment of an annual pension to commence at age 65 or earlier in the event he should become unable to work or the company should cancel the contract. He served the company under

---

[1] SEC. 104. COMPENSATION FOR INJURIES OR SICKNESS.

(a) IN GENERAL.—Except in the case of amount attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include—

*     *     *     *     *     *     *

(2) the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness ;

this contract from 1927 until 1934. After Stanford came to the United States, Kaufhof agreed to "resume payment" of the pension to which, in the words of the letter agreement, he was "entitled on account of prior contracts."

In 1955, a memorandum agreement was executed which provided for an increase in the annual pension from 30,000 to 45,000 marks. The agreement specifically refers to the "increase of pensions" and recites that the "retirement allowances shall be raised by 50 percent."

That petitioner himself in fact understood the nature of the amount in issue to be the payment of his Kaufhof pension is indicated by the statement he attached by way of explanation to his income tax return for 1955 which recited in part that:

Pursuant to a pension agreement entered into in the course of his employment by the Tietz Company, which agreement has been recognized as a valid and subsisting legal obligation of Westdeutsche Kaufhof A.G. the taxpayer is now receiving a regular pension from the said firm based upon and solely attributable to his past activities as an employee of Tietz A.G.

Inasmuch as the evidence before us demonstrates convincingly that the $10,662.48 amount received by petitioners from Kaufhof in 1955 represents the payment of Julian's pension for that year, their second contention that this payment constituted restitution of confiscated property and therefore is a return of capital. is unsupported by the record. There is no showing here that Kaufhof A.G. confiscated any of petitioner's property or that the company in law or in fact is liable for any of petitioner's property that was confiscated by others. Further, it is not shown that any claims actually were filed against Kaufhof for the recovery of property except the indemnification claimed for the loss of his stock in the Kaufhof corporation, which was paid in part. Petitioners have not established that the pension payments were received in lieu of further payments by Kaufhof for petitioner's stock.

Petitioners contend in the alternative that in the event we regard the 1955 payments as representing Julian's pension for that year and therefore compensation, the payments are exempt from taxation under the provisions of section 911(a)(1) of the 1954 Code.[2] Petitioners

---

[2] SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle :

(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States, who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period ; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151 relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph.

maintain that they have satisfied the requirements of section 911(a)(1) since they were citizens of the United States when the amount was received in 1955, they were bona fide residents of Germany during the time the compensation was earned, the 1955 payments were received from a source without the United States, and constituted "earned income" within the meaning of that section. The respondent correctly points out, however, that the petitioners were not citizens of the United States at the time the income was earned and therefore fail to qualify under section 911(a)(1). Contrary to the petitioner's argument, the language of section 911(a)(1) unequivocally requires United States citizenship at the time of foreign residence in order for the recipient of income from foreign sources to qualify for exemption thereunder. The provisions of section 911(a)(1) are plain and unambiguous and clearly contemplate the situation where a citizen of the United States goes abroad and earns income from a foreign source during the period of his nonresidence. Cf. *Arthur J. H. Johnson,* 7 T.C. 1040, 1046.

Petitioners further contend that the 1955 payments are exempt from taxation under section 872(a) of the 1954 Code [3] which exempts income received by a nonresident alien from sources outside the United States. It is of course true that the pension payments here in question were earned by petitioner during his employment by Kaufhof A.G. and that he was a nonresident alien throughout that period. In 1955, the year here in issue, petitioners were citizens and residents of the United States. The amount here involved was received by them at a time when they were United States citizens. To qualify under the provisions of section 872(a), income received by a nonresident alien from sources without the United States must be not only earned but also received by the taxpayer while he actually is a nonresident alien. This is obvious from the language of the statute itself. Consequently, section 872(a) has no application to the petitioners during 1955.

For the foregoing reasons we are of the opinion that the payments received by petitioners from Kaufhof A.G. during 1955 represented the payment of compensation by way of a pension to which the petitioner Julian C. Stanford was contractually entitled, and therefore constitutes taxable income to them for that year under section 61(a) of the 1954 Code.

*Decisions will be entered for the respondent.*

---

[3] SEC. 872. GROSS INCOME.
(a) GENERAL RULE.—In the case of a nonresident alien individual gross income includes only the gross income from sources within the United States.