OLD HARBOR NATIVE CORPORATION, PETITIONER
*v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 8653–93.          Filed January 31, 1995.

*J. Roger Mentz, Linda E. Carlisle,* and *Kurt C. Swainston,* for petitioner.

*Kay Hill* and *James R. Robb,* for respondent.

OPINION

LARO, *Judge:* This case is before the Court fully stipulated under Rule 122(a). Old Harbor Native Corp. petitioned the Court to redetermine respondent's determination of deficiencies of $1,506,888 and $196,563 in its 1987 and 1988 Federal income taxes, respectively. Respondent reflected her determination in a notice of deficiency issued to petitioner on February 10, 1993. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

Following concessions, we must decide:

1. Whether payments of $5,050,000 and $270,000 received by petitioner from Texaco, Inc. (Texaco), during 1987 and 1988, respectively, are "option payments" that are excludable from petitioner's gross income for those years. We hold that they are not;

2. whether unreimbursed expenses of $123,986 incurred by petitioner during 1987 in connection with its proposed exchange of surface rights for subsurface rights are ordinary and necessary business expenses that are deductible from its gross income under section 21(h)(2) of the Alaska Native Claims Settlement Act (ANCSA), Pub. L. 92–203, 85 Stat. 688 (1971) (current version at 43 U.S.C. secs. 1601–1629e (1988)). We hold that they are;

3. whether payments of $58,070 and $28,681 received by petitioner from Koniag Regional Native Corp. (Koniag) during 1987 and 1988, respectively, are includable in petitioner's gross income for those years. We hold that they are.

The record consists primarily of the pleadings and the facts recited in a joint stipulation with accompanying exhibits. The stipulated facts and exhibits are incorporated herein by this reference. Petitioner is an Alaskan native village corporation organized under ANCSA. When the petition was filed, petitioner's place of business was Old Harbor, Alaska.

The Congress enacted ANCSA on December 18, 1971, to extinguish aboriginal land claims of the Alaskan natives. To accomplish a fair and just settlement of these claims, the Congress created an Alaska Native Fund (ANF) of $962.5 million, see 43 U.S.C. sec. 1605, and provided the Alaskan natives with the fee title to over 40 million acres of Alaskan

land. The Congress also provided that the subsurface title to this land would be held by 12 Alaskan native regional corporations (regional corporations), the surface title to approximately 22 million of these acres would be held by over 200 Alaskan native village corporations (village corporations), and the surface title to the remaining acres would be held by the regional corporations. 43 U.S.C. secs. 1611, 1613.

The Secretary of the Interior divided Alaska into 12 geographic regions reflecting the common heritage of the Alaskan natives within each area. See 43 U.S.C. sec. 1606(a). ANCSA required the natives within each of these regions to form a regional corporation under the corporate laws of Alaska to conduct business for profit.[1] 43 U.S.C. sec. 1606(d). Each regional corporation was required to issue 100 shares of stock to every eligible native within its region. 43 U.S.C. sec. 1606(g). The stock entitled the natives/shareholders to all the rights of stockholders in an Alaskan corporation, except that their right to alienate the stock was restricted until December 18, 1991. 43 U.S.C. sec. 1606(h)(1).

The natives in the villages of each region that were eligible for benefits under ANCSA were required to organize a profit or nonprofit village corporation prior to receiving their benefits. 43 U.S.C. sec. 1607. A village was generally eligible for benefits if at least 50 percent of the community's population consisted of more than 24 natives. 43 U.S.C. sec. 1610(b)(2). Over 200 village corporations were formed under ANCSA. 43 U.S.C. sec. 1610(b). The village corporations were neither shareholders nor subsidiaries of the regional corporations.

The Congress included a revenue-sharing system within ANCSA to achieve a rough equality in assets among all Alaskan natives covered by ANCSA. This revenue-sharing system required that 70 percent of the total timber and subsurface revenues received by all of the regional corporations had to be shared among the 12 regional corporations. Numerous disputes among the regional corporations arose in the late 1970's concerning the operation of this system. The regional corporations brought a lawsuit in the U.S. District Court for

---

[1] The Alaska Native Claims Settlement Act (ANCSA), Pub. L. 92–203, 85 Stat. 688 (1971) (current version at 43 U.S.C. secs. 1601–1629e (1988)), vests each regional corporation with certain village corporation control functions and requires each regional corporation to actively participate in the development of its region. Each regional corporation must approve the initial articles of incorporation for each village corporation in its region. 43 U.S.C. sec. 1607(b).

the District of Alaska to resolve their disputes. See *Aleut Corp. v. Arctic Slope Regional Corp.*, A75–53 Civil (D. Alaska). The regional corporations settled their disputes in June 1982 through a court-approved agreement (settlement agreement). The settlement agreement contained a complex set of provisions detailing the obligations of the regional corporations under the revenue-sharing system.[2]

The revenue-sharing system requires that the natives who were shareholders in a regional corporation receive payments of at least 10 percent of certain funds received by the regional corporation for the first 5 years following enactment of ANCSA. These funds are from the following sources: (1) The ANF, (2) timber resources and subsurface estates, and (3) all other net income. 43 U.S.C. sec. 1606(j). The regional corporations also must distribute not less than 45 percent of these funds during the first 5 years after enactment of ANCSA to: (1) The village corporations in its region and (2) the shareholders of the regional corporations who were not residents of villages.[3] 43 U.S.C. sec. 1606(j). The 45-percent rate increased to 50 percent for all years after the first 5 years (hereinafter, these required payments under section 7(j) of ANCSA, 43 U.S.C. sec. 1606(j), are referred to as section 7(j) payments). *Id.* The section 7(j) payments must be divided among the village corporations according to a specified ratio. 43 U.S.C. sec. 1606(k); see also 43 U.S.C. sec. 1606(i).

Petitioner received $58,070 and $28,681 in 1987 and 1988, respectively, from Koniag as petitioner's share of section 7(j) payments. None of these payments were from the ANF. Petitioner did not provide any services, perform any act, sell or license any property interest, or provide any other form of consideration to Koniag in order to receive the section 7(j) payments.

Petitioner did not include the section 7(j) payment of $28,681 in its 1988 income. Petitioner reported the section 7(j) payment of $58,070 as income on its 1987 Federal income

---

[2] The settlement agreement generally requires each regional corporation to compute its gross revenues and allowable deductions as of the end of each fiscal year, and to pay its revenues within 90 days after the end of those years. Each regional corporation must also transmit to the other regional corporations an annual report of its transactions within 180 days after the year's end.

[3] Notwithstanding this distribution requirement, a regional corporation may withhold the funds pending a satisfactory village plan or to finance a project that will benefit its region in general. 43 U.S.C. sec. 1606(m); see also 43 U.S.C. sec. 1606(i) and (j).

tax return, but amended this return in order to exclude the section 7(j) payment from its income. Petitioner also increased its net operating loss deduction for 1987 by $53,010 to reflect an exclusion of section 7(j) payments from its 1985 and 1986 income.[4] Respondent determined that all of these section 7(j) payments constituted taxable income to petitioner at the times of receipt.

The United States conveyed various surface estates to petitioner under ANCSA. These surface estates included approximately 35,000 acres within the Kodiak National Wildlife Refuge (KNWR) and approximately 65,000 acres on Sitkalidak Island within the Alaska Maritime National Wildlife Refuge (AMNWR). The Department of the Interior (DOI) desired to reacquire the surface rights that had been conveyed to petitioner. Petitioner commenced discussions with the DOI in 1985 to consider exchanging the surface rights owned by petitioner in the KNWR and the AMNWR for Government-owned subsurface rights in oil and gas located in the Arctic National Wildlife Refuge on the North Slope of Alaska (ANWR). Petitioner and the DOI negotiated the terms of a proposed exchange agreement (proposed DOI agreement) that included such an exchange.[5]

The proposed DOI agreement was contingent upon the occurrence of the following three events: (1) Ratification of the proposed DOI agreement by petitioner's shareholders; (2) enactment by the Congress of legislation opening the ANWR to oil and gas development (opening legislation); and (3) enactment by the Congress of legislation approving the proposed DOI agreement (exchange legislation).[6] Both petitioner and the DOI could cancel the proposed DOI agreement if either the opening or exchange legislation was not enacted by December 31, 1993. Petitioner could also cancel the proposed DOI agreement within 60 days of enactment of the opening or exchange legislation if: (1) The form and content of the opening legislation was not satisfactory to it; (2) the exchange

---

[4] Petitioner received sec. 7(j) payments of $21,915 and $31,095 during 1985 and 1986, respectively.

[5] We use the term "proposed DOI agreement" because this proposed agreement was never signed on behalf of the Secretary of the DOI.

[6] The proposed DOI agreement required congressional assent because the ANWR was not open to oil and gas development, and the Secretary of the DOI could not convey an interest in the ANWR without congressional approval. Act of Aug. 16, 1988, Pub. L. 100–395, sec. 201, 102 Stat. 979, 990 (amending the Alaska National Interest Lands Conservation Act, Pub. L. 96–487, 94 Stat. 2371 (1980)).

legislation amended or altered petitioner's rights and obligations under the proposed DOI agreement; or (3) petitioner was unsatisfied with any provision of the exchange legislation that was not covered in the proposed DOI agreement.[7]

Petitioner entered into three agreements with Texaco regarding the subsurface rights that it might acquire in the proposed DOI agreement.[8] Under the terms of these agreements, Texaco would identify land within the ANWR that it believed had potential for oil and gas exploration, and petitioner would exchange its rights in the KNWR and the AMNWR for the subsurface rights in that land. During July 1987, petitioner (assisted by Texaco) and the Secretary of the Interior (acting pursuant to authority granted under section 43 U.S.C. sec. 1621(f)) identified the subsurface rights in the ANWR that petitioner would receive in exchange for its rights in the KNWR and the AMNWR.

The Kodiak agreement and the Sitkalidak agreement (hereinafter referred to collectively as the lease agreements) granted Texaco the privilege to lease all of the subsurface rights in the ANWR that petitioner might receive under the proposed DOI agreement. Texaco's privilege to lease these rights was contingent on the Congress' enacting the opening and exchange legislation. After this contingency was met, Texaco could lease petitioner's subsurface rights in the ANWR by electing to do so within the 15- to 40-day period beginning after the date on which the legislation was enacted.

In consideration for the privilege to lease petitioner's subsurface rights in the ANWR, Texaco covenanted in the Kodiak agreement to: (1) Identify the rights that petitioner would select under the proposed DOI agreement; (2) advise petitioner in negotiating the proposed DOI agreement and forming an appropriate exploration and development plan to recommend to the DOI; (3) attempt to employ and train qualified residents of Old Harbor, Alaska, during Texaco's exploration of petitioner's subsurface rights in the ANWR; (4) reimburse

---

[7] Although the terms of the proposed DOI agreement allowed petitioner to cancel the proposed agreement in these three situations, petitioner contemporaneously agreed with Texaco that it (petitioner) would not exercise this right.

[8] We refer to the first agreement, dated Jan. 23, 1987, as the Kodiak agreement. We refer to the second agreement, dated Feb. 23, 1987, as the Canaan agreement. We refer to the third agreement, dated Mar. 3, 1987, as the Sitkalidak agreement. Texaco terminated the Canaan agreement in March 1987. The Canaan agreement did not create the rights, obligations, or income in issue herein.

petitioner for certain costs that it might incur in connection with the proposed DOI agreement, including costs for promoting the opening and exchange legislation and; (5) indemnify petitioner for certain litigation costs in connection with the proposed DOI agreement. Texaco also agreed to: (1) Pay petitioner $500,000 when its shareholders ratified the Kodiak agreement and the proposed DOI agreement (signing payment); (2) pay petitioner $2 million when it selected the subsurface rights that it would receive under the proposed DOI agreement, provided that its shareholders had already ratified the proposed DOI agreement (selection payment); (3) pay petitioner $1 million when its shareholders ratified the proposed DOI agreement, provided that both the opening and exchange legislation were enacted; (4) reimburse petitioner up to $250,000 for nonlitigation expenses incurred in connection with the proposed DOI agreement; (5) pay petitioner $25,000 per quarter from the date that its shareholders ratified the proposed DOI agreement until the earlier of the date that both the opening and exchange legislation were enacted or the Kodiak agreement was terminated (quarterly payments); (6) pay petitioner the value set by it and the DOI as the exchange value,[9] less certain amounts previously paid, if the contingencies were resolved and Texaco elected to lease petitioner's subsurface rights in the ANWR; (7) pay petitioner a minimum of $5,000 per year for scholarships and; (8) pay petitioner its reasonable litigation expenses up to $100,000 per year. The duties of Texaco under the Sitkalidak agreement were substantially the same as its duties under the Kodiak agreement. The major difference between the two agreements was that the signing payment under the Kodiak agreement was not applied against the lease price.[10]

The lease agreements terminated automatically if: (1) The DOI terminated the proposed DOI agreement or failed to assign an exchange value to petitioner's surface rights in the AMNWR before Texaco identified subsurface rights in the ANWR that petitioner would receive in exchange or (2) the proposed DOI agreement was voided by a final administrative

---

[9] The DOI and petitioner set the value of petitioner's interest in the KNWR and the AMNWR at $45,701,112.12 in the proposed DOI agreement.

[10] Petitioner agreed in the lease agreements to: (1) Execute the proposed DOI agreement with the DOI; (2) select the subsurface rights in the ANWR land that were identified by Texaco; and (3) promote the opening and exchange legislation.

or court order and all avenues of appeal were exhausted or expired. Texaco could unilaterally terminate the lease agreements within the 30-day period following its identification of the subsurface rights in the ANWR, or Texaco could terminate the lease agreements if: (1) The opening and exchange legislation was not enacted by certain specified dates or (2) petitioner did not receive its shareholder approval by another specified date. Petitioner could not unilaterally terminate the lease agreements.

Texaco terminated the lease agreements in December 1993 pursuant to the terms therein. The Congress had not enacted the opening or exchange legislation.[11] During 1987 and 1988, Texaco had remitted the following amounts to petitioner under the lease agreements:

| *1987* | *Kodiak* | *Sitkalidak* |
| --- | --- | --- |
| Quarterly payments | $25,000 | $25,000 |
| Signing payments | 500,000 | 500,000 |
| Selection payments | 2,000,000 | 2,000,000 |
| Total | 2,525,000 | 2,525,000 |

| *1988* | | |
| --- | --- | --- |
| Quarterly payments | $125,000 | $125,000 |
| Scholarship payments | 10,000 | 10,000 |
| Total | 135,000 | 135,000 |

Petitioner did not include any of these amounts in its gross income.

Petitioner deducted $1,024,436 and $331,896 for 1987 and 1988, respectively, for expenses that it incurred in lobbying the Congress to open the ANWR for oil and gas development and to obtain congressional approval of the proposed DOI agreement (hereinafter we refer to these expenditures as land selection costs).[12] The parties agree that $900,450 of the 1987 expenditures and all of the 1988 expenditures are deductible from petitioner's gross income for those years. The

---

[11] Petitioner received the necessary shareholder approval to enter into the lease agreements and the proposed DOI agreements.

[12] Pursuant to the lease agreements, Texaco reimbursed petitioner for $753,294 and $396,418 of these expenditures during 1987 and 1988, respectively. Petitioner included these reimbursements in its income for the years of receipt.

parties dispute the deductibility of the remaining $123,986 that petitioner paid and incurred for outside legal services to lobby the Congress to pass the opening and exchange legislation. Among other things, the law firms contacted members of the Congress and their staffs and prepared promotional materials. These services constitute lobbying activities under section 308(a) of the Federal Regulation of Lobbying Act of 1946, ch. 753, 60 Stat. 841 (current version at 2 U.S.C. sec. 267(a) (1988)).

The principal issue in this case pertains to the tax treatment of certain payments petitioner received from Texaco. Texaco made these payments to petitioner in order to secure the privilege of leasing subsurface rights which petitioner might obtain under ANCSA pursuant to the proposed DOI agreement. The Congress enacted ANCSA to extinguish the aboriginal land claims of Alaskan natives.

The ANCSA legislation generally exempted from taxation the regional and village corporations' initial receipt of rights in the Government-owned land. See 43 U.S.C. sec. 1620. However, the Congress did not specify the exact manner of taxing the revenues subsequently generated from these rights. Therefore, we must ascertain their appropriate tax treatment. We look first to ANCSA, as the statute that extinguished the aboriginal land claims of the Alaskan natives. See 43 U.S.C. sec. 1620. To the extent that ANCSA is not determinative, we then look to the Internal Revenue Code, as the statutory scheme of Federal taxation.

1. *Payments Received by Petitioner Under the Lease Agreements*

Petitioner argues that the proceeds from the lease agreements are not taxable in the year of receipt because the lease agreements are options. Petitioner contends that the lease agreements granted Texaco the option to lease the subsurface rights in the ANWR to be received by petitioner. Respondent replies that the proceeds for the lease agreements are taxable in the year of receipt. According to respondent, petitioner did not grant Texaco an option. Rather, respondent contends, petitioner granted Texaco a future and conditional election which she refers to as a right of first refusal. Whether the lease agreements are options is

determinative of this issue. Before answering this question, however, we shall discuss the taxability of options in order to highlight the relevance of this classification.

An item of income is generally included in a corporation's gross income for the year that is no later than the year during which the item is received by the corporation. Sec. 451(a). Payments received by a corporation for an option to acquire a capital asset, however, are not always recognized in or before the year of receipt. Rather, payments for such an option are recognized in the year that the option is exercised or is allowed to lapse. If the option lapses, the payments received for it are generally considered ordinary income in the year of the lapse, unless the optioned property is stock, securities, commodities, or commodity futures. See sec. 1234(b). If the option is exercised, the payments received for it are added to the sale price of the subject asset in the year of the exercise. In the latter case, the payments for the option are eligible for capital gain treatment as part of the proceeds from the sale of the underlying asset. *Koch v. Commissioner,* 67 T.C. 71 (1976); *Dill Co. v. Commissioner,* 33 T.C. 196 (1959), affd. 294 F.2d 291 (3d Cir. 1961); *Virginia Iron Coal & Coke Co. v. Commissioner,* 37 B.T.A. 195 (1938), affd. 99 F.2d 919 (4th Cir. 1938).

The deferral of the taxability of option payments is based on two important tax considerations. First, the grantor of an option must wait until the option is exercised or lapses to determine whether the proceeds for it are reportable as taxable income or as a nontaxable return of capital. Second, even assuming arguendo that the option proceeds would be income to the grantor, the grantor must determine whether the character of the income is capital or ordinary. Such a determination normally must wait until the option is exercised or is allowed to lapse.[13]

Following our careful review of those considerations, we will not allow petitioner to defer recognition of the proceeds

---

[13] In this regard, the Court of Appeals for the Tenth Circuit has held that payments for an option to acquire a lease on oil and gas property are taxable in the year of receipt because these payments will always be taxed as ordinary income. *Commissioner v. Pickard,* 401 F.2d 615 (10th Cir. 1968), revg. and remanding 46 T.C. 597 (1966). Both parties state on brief their disagreement with the rationale of the Court of Appeals for the Tenth Circuit because it ignores that option payments made to acquire an oil and gas lease will become ordinary income *subject to depletion* if the option is exercised. Based on our conclusion that the lease agreements are not options, we need not decide this matter.

from the lease agreements unless those agreements are options. Otherwise petitioner has advanced no reason to defer the recognition of these nonreturnable payments, which it had the unfettered right to use and enjoy for its own benefit. We have found no authority, nor has petitioner cited us any, that would extend deferral treatment to petitioner's agreements with Texaco unless they qualify as options. See, e.g., *Saunders v. United States,* 450 F.2d 1047 (9th Cir. 1971); *Saviano v. Commissioner,* 80 T.C. 955, 971 (1983) (taxpayer not allowed to defer recognition of payment received for a right of first refusal), affd. 765 F.2d 643 (7th Cir. 1985).[14]

We now proceed to determine whether the lease agreements are options.[15] See *Commissioner v. P.G. Lake Inc.,* 356 U.S. 260 (1958); *Helvering v. F. & R. Lazarus & Co.,* 308 U.S. 252 (1939). We look to the substantive provisions of the lease agreements and the parties' conduct with respect thereto. We do not afford controlling weight to the terms embodied in the lease agreements. *Frank Lyon Co. v. United States,* 435 U.S. 561, 573 (1978).

An option has historically required the following two elements: (1) A continuing offer to do an act, or to forbear from doing an act, which does not ripen into a contract until accepted; and (2) an agreement to leave the offer open for a specified or reasonable period of time. *Saviano v. Commissioner, supra* at 970. The primary legal effect of an option is that it limits the promisor's power to revoke his or her offer. An option creates an unconditional power of acceptance in the offeree. See 1 Restatement, Contracts 2d, sec. 25(d) (1981). An option is not a right of first refusal. *City of Kenai v. Burnett,* 860 P.2d 1233, 1240 (Alaska 1993).

Respondent relies on *Booker v. Commissioner,* 27 T.C. 932 (1957), and *Saviano v. Commissioner, supra.*[16] Respondent argues that these cases require the holder of an option to have the present ability to accept the offer. Petitioner replies

---

[14] The taxpayer in the *Saviano* case argued before the Court of Appeals for the Seventh Circuit that, although a right of first refusal does not meet the classic definition of an option, the taxability of the payments received for such a right should be deferred under the "open transaction" doctrine. The court rejected this argument. *Saviano v. Commissioner,* 765 F.2d at 652.

[15] Our research has uncovered no Alaska cases that squarely address the facts at bar, and we find the numerous Alaska cases cited by the parties unhelpful to our inquiry.

[16] Respondent also relies on *Anderson v. United States,* 468 F. Supp. 1085 (D. Minn. 1979), affd. without published opinion 624 F.2d 1109 (8th Cir. 1980), and *Saunders v. United States,* 450 F.2d 1047 (9th Cir. 1971).

that it granted Texaco an option, even assuming arguendo that Texaco's privileges were contingent upon certain acts of the Congress and petitioner. According to petitioner, the cases cited by respondent are distinguishable from the case at bar because petitioner did not retain complete control over the subject property and could not have prevented Texaco from unilaterally accepting petitioner's offer to lease that property.

We are unpersuaded by petitioner's argument. Texaco's right to lease the subsurface rights in the ANWR that petitioner might obtain under the proposed DOI agreement was too vague and uncertain to constitute an unconditional option to lease those rights. *Booker v. Commissioner, supra.* Indeed, petitioner never executed an agreement with the Government to receive title to (or any other interest in) those subsurface rights. As a point of fact, the proposed DOI agreement conveyed to petitioner no interest whatsoever in the subsurface rights because the agreement was never signed by the Government. Alaska Stat. sec. 09.25.010(a)(6) (1994). Thus, petitioner had to first acquire the subsurface rights before it, in turn, could sell these rights to Texaco. The lease agreements were otherwise unenforceable until petitioner acquired ownership of these rights.

We also find critical the fact that the proposed DOI agreement was subject to various contingencies outside of petitioner's control, and that two of these contingencies were never met. Notwithstanding the fact that petitioner may have lobbied the Congress to enact the opening and exchange legislation, the power to enact this legislation always remained completely in the hands of the Congress. Without congressional approval, petitioner would never be able to receive the Government-owned subsurface rights. Until the time that the Congress enacted this legislation, which it never did, Texaco possessed nothing more than a *mere expectancy* of receiving those rights. *Saviano v. Commissioner, supra* at 971; *Booker v. Commissioner, supra* at 939. Furthermore, enactment of the opening and exchange legislation, in and of itself, would not have conveyed to petitioner an interest in the subsurface rights. The Secretary of the DOI would still have had to sign the proposed DOI agreement.

We find relevant *Saviano v. Commissioner, supra.* In the *Saviano* case, the taxpayer invested in a tax shelter offering

investments in a gold claim. According to the underlying plan, the taxpayer sold a purported option to buy the gold extracted from a mine. The "option" did not obligate the grantor to mine any gold. In concluding that the "option" to purchase the extracted gold was not a true option, we noted that "If the optionee's power to accept is dependent upon some further act of the offeror, then there is no unconditional option contract." *Saviano v. Commissioner,* 80 T.C. at 970.

In the instant case, the lease agreements are not options. The lease agreements did not contain an unconditional right for Texaco to lease a subsurface right in the ANWR that petitioner owned or had a vested right to receive. At best, the lease agreements were inchoate contracts that possibly could have ripened into options if and when: (1) The Congress enacted the opening and exchange legislation and (2) petitioner received the Government-owned subsurface rights. Until that time, Texaco had nothing more than a mere expectancy of leasing these rights. *Saviano v. Commissioner, supra* at 971; *Booker v. Commissioner, supra* at 939. For the foregoing reasons, we hold that the payments received by petitioner from Texaco for the lease agreements are taxable in the year of receipt.[17] *Saunders v. United States, supra*; *Saviano v. Commissioner, supra*; *Booker v. Commissioner, supra*. But cf. *Adair v. Commissioner,* T.C. Memo. 1985–392.

## 2. Land Selection Costs

The Congress included a provision in ANCSA to address the tax treatment of the land selection costs:

All expenses heretofore or hereafter paid or incurred by a Native Corporation established pursuant to this chapter *in connection with the selection or conveyance of lands pursuant to this chapter* [33] * * * shall be deemed to be or to have been ordinary and necessary expenses of such Corporation, paid or incurred in carrying on a trade or business for purposes of any form of Federal, State, or local taxation. [43 U.S.C. sec. 1620(h)(2); emphasis added.]

---

[17] We also believe that the payments that Texaco made to petitioner for the lease agreements were not made in their entirety for the privilege of electing to lease the subsurface rights that petitioner might have received from the Government. Among other things, we find that petitioner received part of those payments in consideration of its agreeing to promote the opening and exchange legislation. In addition, we find that Texaco executed the lease agreements, in part, to persuade petitioner to consummate the proposed DOI agreement.

We must decide whether petitioner's unreimbursed lobbying expenses of $123,986 were incurred in connection with the conveyance of land pursuant to chapter 33 (i.e., ANCSA). Petitioner incurred these expenses in order to satisfy the contingencies for the exchange of the land described in the proposed DOI agreement.

Resolution of this issue turns on whether the phrase "in connection with the selection or conveyance of lands pursuant to this chapter" under 43 U.S.C. section 1620(h)(2) includes a conveyance of land under 43 U.S.C. section 1621(f).[18] Respondent claims that it does not. According to her, 43 U.S.C. section 1620(h)(2) pertains only to: (1) The Government's initial conveyance of land to petitioner under ANCSA and (2) any other transfers that are explicitly listed in ANCSA. Thus, respondent argues, the land selection costs must be capitalized under section 263, as a part of the cost of acquiring property. Respondent relies mainly on the legislative history underlying section 1620(h)(2) of ANCSA, including, primarily, a statement by Senator Gravel that was made on the Senate floor. See 124 Cong. Rec. 33970–33971 (1978).

We do not read 43 U.S.C. section 1620(h)(2) as narrowly as respondent. To the contrary, we read ANCSA broadly and in the light most favorable to Alaskan natives, the intended beneficiaries of ANCSA. *Bryan v. Itasca County,* 426 U.S. 373, 392 (1976); *Squire v. Capoeman,* 351 U.S. 1, 7 (1956); *Alaska Pac. Fisheries v. United States,* 248 U.S. 78, 89 (1918); *Chugach Alaska Corp. v. United States,* 34 F.3d 1462 (9th Cir. 1994). We also view and read ANCSA as a whole, rather than viewing and reading each section of ANCSA separately and in isolation. *Stanford v. Commissioner,* 297 F.2d 298, 308 (9th Cir. 1961), affg. 34 T.C. 1150 (1960). The phrase "pursuant to this chapter", which follows the phrase "in connection with the selection or conveyance of lands", refers to any section within ANCSA. This statutory language is clear and unambiguous. Therefore, the beginning and end of our inquiry is the statutory text, and we apply the plain and common meaning

---

[18] Forty-three U.S.C. sec. 1621(f) provides:

The Secretary [of the Interior, see sec. 3(a) of ANCSA, 43 U.S.C. 1602] * * * [is] authorized to exchange lands or interests therein, including Native selection rights, with the corporations organized by Native groups, Village Corporations, Regional Corporations, and the corporations organized by Natives * * * and other municipalities and corporations or individuals, the State * * *, or any Federal agency for the purpose of effecting land consolidations or to facilitate the management or development of the land, or for other public purposes. * * *

of the text as written by the Congress. *TVA v. Hill,* 437 U.S. 153, 185 n.29 (1978); *United States v. American Trucking Associations,* 310 U.S. 534, 543 (1940); see also *Garcia v. United States,* 469 U.S. 70, 76 n.3 (1984) ("Resort to legislative history is only justified where the face of the * * * [statute] is inescapably ambiguous"). It is well settled that the text is conclusive, absent a clear legislative intent to the contrary. *Consumer Prod. Safety Commn. v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980); see also *Landreth v. Commissioner,* 859 F.2d 643, 646 n.6 (9th Cir. 1988) (only "unequivocal evidence" of legislative purpose in the history to a statute may override the plain meaning of the words therein), affg. T.C. Memo. 1986–242. We have found no *clear* legislative intent to the contrary.

Applying the preceding law to the facts at bar, we conclude that petitioner's lobbying expenses respecting the proposed exchange of its surface rights in the KNWR and in the AMNWR for the Government's subsurface rights in the ANWR were incurred in connection with a conveyance of land within the meaning of 43 U.S.C. section 1620(h)(2). Thus, it follows that petitioner's unreimbursed lobbying expenses of $123,986 are deductible under that section. We so hold.[19]

### 3. *Section 7(j) Payments*

Payments from the ANF are not taxable to a regional corporation, village corporation, or individual native. 43 U.S.C. sec. 1620(a). Income from the investment of these payments is. *Id.* Further, rents, royalties, profits, and other revenues derived from properties transferred to Alaskan natives pursuant to ANCSA are also taxable. 43 U.S.C. sec. 1620(d)(1). Such revenues are pooled by the regional corporations and allocated among them under the revenue-sharing system in section 7(i) and (j) of ANCSA. We must decide whether the portion of the pooled revenues received by petitioner is taxable to it.

ANCSA requires that certain revenues of the regional corporations must be pooled and that Koniag, as a regional corporation, must distribute petitioner's portion of these pooled

---

[19] Respondent argued that petitioner's unreimbursed expenses were either deductible under 43 U.S.C. sec. 1620(h)(2) or capitalized under sec. 263. We assume that respondent has conceded any applicability of sec. 263 to an expense that would otherwise be deductible under 43 U.S.C. sec. 1620(h)(2).

revenues to it. See 43 U.S.C. sec. 1606(i). Petitioner's right to receive these section 7(j) payments during the years in issue did not arise because Koniag set aside part of its earnings and profits on either its own volition or by agreement with petitioner. Rather, petitioner's right to a share of the section 7(j) payments arose under ANCSA.

Petitioner is not required to further distribute the section 7(j) payments when it receives them. Instead, petitioner has the unfettered discretion to apply these funds in the manner that it desires. We believe that petitioner's unfettered discretion, coupled with the absence of any restriction placed on petitioner to use or dispose of its share of the section 7(j) payments, results in a true economic benefit to it. See *Commissioner v. Indianapolis Power & Light Co.*, 493 U.S. 203 (1990); *North American Oil Consol. v. Burnet*, 286 U.S. 417, 424 (1932); *Kansas City S. Indus. v. Commissioner*, 98 T.C. 242, 262 (1992); *Clark v. Commissioner*, 11 T.C. 672 (1948). Accordingly, we conclude that the section 7(j) payments are taxable to petitioner when it receives them, absent a specific exemption or deferral from taxation. With the exception of payments originating from the ANF, which are nontaxable to petitioner under 43 U.S.C. section 1620, we find no exemption or deferral provision to the contrary. Therefore, petitioner must include the section 7(j) payments in its income when it receives them from Koniag, except to the extent that the payments are from the ANF. Given that none of the section 7(j) payments in the years in issue were from the ANF, petitioner must include in income the total amount of the section 7(j) payments that it received from Koniag during those years.[20]

Petitioner argues that its portion of section 7(j) payments is not taxable because these payments were received as a nontaxable contribution to its capital by a nonshareholder (Koniag) under section 118 and the regulations thereunder. Petitioner relies on G.C.M. 36720 (May 6, 1976), in which respondent concluded that section 7(j) payments received by a village corporation are neither a contribution to its business nor compensation payable to it for its service. We are unpersuaded by petitioner's argument. First, a general coun-

---

[20] The sec. 7(j) payments of $21,915 and $31,095 that petitioner received in 1985 and 1986, respectively, are also taxable. Therefore, petitioner may not increase its net operating loss deduction for 1987 by these amounts.

sel memorandum is not binding precedent on this Court. A general counsel memorandum is a legal opinion from one division of the Commissioner's Office of Chief Counsel to another. See *Morganbesser v. United States,* 984 F.2d 560, 563 (2d Cir. 1993). Second, shortly after its release respondent reconsidered this issue within G.C.M. 36720 (May 6, 1976), disagreed with it, and published her modified position on December 10, 1976.

We have considered the parties' other arguments and find them to be without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*